Rachael Peters Pugel (#032626)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: rpugel@swlaw.com
Attorneys for Plaintiff Herbal Brands, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Herbal Brands, Inc.,

          Plaintiff,

v.

Photoplaza Inc; Goldshop 300 Inc;
Goldshop Inc; InStock Goodies Inc; Tzvi
Heschel; Shloma Bichler; Lali Dats; and
John Does 1-10,

          Defendants.

No.

**COMPLAINT FOR DAMAGES,
INJUNCTIVE AND OTHER
RELIEF, FOR VIOLATIONS OF 15
U.S.C. § 1114; 15 U.S.C. § 1125(a);
AND RELATED CLAIMS**

**DEMAND FOR JURY TRIAL**

    Plaintiff Herbal Brands, Inc. ("Herbal Brands" or "Plaintiff") brings this action against Defendants Photoplaza Inc, Goldshop 300 Inc, Goldshop Inc, Instock Goodies Inc, Tzvi Heschel, Shloma Bichler, Lali Dats, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(b); (4) common law trademark infringement and unfair competition; and (5) tortious interference with contracts and business relationships. These claims arise from Defendants' misappropriation of Herbal Brands' trademarks in connection with Defendants' unlawful and unauthorized advertisement and sale of non-genuine products bearing Herbal Brands Trademarks on the

Internet.  In support of its Complaint, Herbal Brands alleges as follows:

**PARTIES**

1.      Herbal Brands is a corporation, organized under the laws of Delaware, with its principal place of business located in Tempe, Arizona.

2.      As detailed in the following Paragraphs, multiple defendants are acting in concert as part of a coordinated scheme to sell products bearing Herbal Brands' trademarks without authorization through multiple storefronts.  All of the defendants are acting in concert and are jointly responsible for the conduct complained of herein.

3.      Defendant Photoplaza Inc is a corporation, organized under the laws of New York, with its principal place of business located in Brooklyn, New York.  Corporate documents that Photoplaza Inc has filed with the New York Secretary of State list 1552 43rd Street, Brooklyn, New York 11219 as the business address to which service of process should be directed.

4.      Defendant Tzvi Heschel ("Heschel") is a natural person who, upon information and belief, resides at 1808 55th Street, Apt. 3, Brooklyn, New York 11204.

5.      Defendant Goldshop 300 Inc is a corporation, organized under the laws of New York, with its principal place of business located in Brooklyn, New York.  The only corporate document that Goldshop 300 Inc has filed with the New York Secretary of State is a certificate of incorporation, and that certificate lists 130 Lee Ave., #300, Brooklyn, New York 11211 as the business address to which service of process should be directed, though this location is, in fact, a post office box located within a private mail facility.

6.      Defendant Shloma Bichler ("Bichler") is a natural person who, upon information and belief, resides at 687 E. 5th St., Apt. 2, Brooklyn, New York 11218-5806.

7.      Defendant Goldshop Inc is a corporation, organized under the laws of New York, with its principal place of business located in Brooklyn, New York.  The only corporate document that Goldshop Inc has filed with the New York Secretary of State is a certificate of incorporation, and that certificate lists 130 Lee Ave., #300, Brooklyn, New York 11211 – the same address as Goldshop 300 Inc – as the business address to which

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

service of process should be mailed.

8.     Defendant Lali Dats ("Dats") is a natural person who, upon information and belief, resides at 1323 55th Street, Apt. 3, Brooklyn, New York 11219.

9.     Defendant InStock Goodies Inc is a corporation, organized under the laws of New York, with its principal place of business located in Brooklyn, New York.  The only corporate document that InStock Goodies Inc has filed with the New York Secretary of State is a certificate of incorporation, and that certificate lists 1352 42nd St., Brooklyn, New York 11219 – Dats' previous home address – as the business address to which service of process should be mailed.

10.     Defendants operate a storefront on www.amazon.com ("Amazon") that is currently called "GOLDSHOP" (the "GOLDSHOP Storefront").  This storefront has an Amazon Merchant ID of A23802NT41XFIY, and can be accessed at https://www.amazon.com/sp?seller=A23802NT41XFIY.     Defendants do business throughout the United States through their GOLDSHOP Storefront.

11.     Upon information and belief, Photoplaza Inc was formed on or around October 31, 2018 when a certificate of incorporation was filed with the New York Secretary of State.   The certificate is signed by Heschel, lists Heschel as the incorporator of Photoplaza Inc, has listed Heschel as an agent of Photoplaza Inc, and does not list any other individuals as officers of Photoplaza Inc.  On December 23, 2020, Photoplaza Inc filed a Certificate of Change with the New York Secretary of State, changing the business address for service of process from "Tzvi Heschel, 1808 55th ST, Brooklyn, BROOKLYN, NY 11204" to "THE CORP, 1808 55th ST, BROOKLYN, NEW YORK 11219."     The December 2020 Certificate of Change lists Heschel as the President of Photoplaza Inc.  On January 27, 2021, Photoplaza Inc filed a Certificate of Change with the New York Secretary of State, changing the business address to "THE CORP, 1552 43RD STREET, BROOKLYN, NE 11219."  The January 2021 Certificate of Change again lists Heschel as the President of Photoplaza Inc.  Accordingly, upon information and belief, Heschel is in control of, a principal of, and responsible for Photoplaza Inc and its actions.

12.     Herbal Brands asserts claims against Heschel in both his individual capacity as well as his capacity as a corporate officer of Photoplaza Inc.

13.     Upon information and belief, Goldshop 300 Inc was formed on or around November 8, 2018 when a certificate of incorporation was filed with the New York Secretary of State.  The certificate is signed by Bichler, lists Bichler as the incorporator of Goldshop 300 Inc, lists Bichler as an agent of Goldshop 300, and does not list any other individuals as officers of Goldshop 300 Inc.  Goldshop 300 Inc has not filed any other corporate documents with the New York Secretary of State.  Accordingly, upon information and belief, Bichler is in control of, a principal of, and responsible for Goldshop 300 Inc and its actions.

14.     Herbal Brands asserts claims against Bichler in both his individual capacity as well as his capacity as a corporate officer of Goldshop 300 Inc.

15.     Upon information and belief, Goldshop Inc was formed on or around August 6, 2018 when a certificate of incorporation was filed with the New York Secretary of State. The certificate is signed by Dats, lists Dats as an agent of Goldshop Inc, and does not list any other individuals as officers of Goldshop Inc.  Goldshop Inc has not filed any other corporate documents with the New York Secretary of State.  Accordingly, upon information and belief, Dats is in control of, a principal of, and responsible for Goldshop Inc and its actions.

16.     Herbal Brands asserts claims against Dats in both her individual capacity as well as her capacity as a corporate officer of Goldshop Inc.

17.     Until it conducts discovery, Herbal Brands cannot conclusively determine whether Heschel, Bichler, and Dats in their individual capacities, or all Defendants, operate the GOLDSHOP Storefront.

18.     Alternatively, upon information and belief, Heschel directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Herbal Brands' trademarks by Photoplaza Inc.  Accordingly, Heschel is personally liable for infringing activities of Photoplaza Inc without regard to piercing the corporate veil.

19.     Alternatively, upon information and belief, Photoplaza Inc follows so few corporate formalities and is so dominated by Heschel that it is merely an alter ego of Heschel.  This is reflected, in part, by the facts that Heschel is both the incorporator and has been an agent of Photoplaza Inc and Photoplaza Inc and has not identified any other corporate officer or individual involved in its operation.  Accordingly, Herbal Brands is entitled to pierce the corporate veil of Photoplaza Inc and hold Heschel personally liable for the infringing activities of Photoplaza Inc.

20.     Alternatively, upon information and belief, Bichler directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Herbal Brands' trademarks by Goldshop 300 Inc.  Accordingly, Bichler is personally liable for infringing activities of Goldshop 300 Inc without regard to piercing the corporate veil.

21.     Alternatively, upon information and belief, Goldshop 300 Inc follows so few corporate formalities and is so dominated by Bichler that it is merely an alter ego of Bichler.  This is reflected, in part, by the facts that Bichler is both the incorporator and agent and Goldshop 300 Inc, has filed only a single corporate document with the New York Secretary of State, and has not identified any other corporate officer or individual involved in its operation.  Accordingly, Herbal Brands is entitled to pierce the corporate veil of Goldshop 300 Inc and hold Bichler personally liable for the infringing activities of Goldshop 300 Inc.

22.     Alternatively, upon information and belief, Dats directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Herbal Brands' trademarks by Goldshop Inc.  Accordingly, Dats is personally liable for infringing activities of Goldshop Inc without regard to piercing the corporate veil

23.     Alternatively, upon information and belief, Goldshop Inc follows so few corporate formalities and is so dominated by Dats that it is merely an alter ego of Dats.  This is reflected, in part, by the facts that Dats is both the incorporator and agent and Goldshop Inc, has filed only a single corporate document with the New York Secretary of State, and has not identified any other corporate officer or individual involved in its operation.  Accordingly, Herbal Brands is entitled to pierce the corporate veil of Goldshop Inc and hold

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Dats personally liable for the infringing activities of Goldshop Inc.

24.    Additionally, Defendants operate a storefront on Amazon that is currently called "InStock Goodies" (the "InStock Goodies Storefront").  This storefront has an Amazon Merchant ID of A25JBQL2ACUML9, and can be accessed at https://www.amazon.com/sp?seller=A25JBQL2ACUML9.  Defendants do business throughout the United States through their InStock Goodies Storefront.

25.    Upon information and belief, InStock Goodies Inc was formed on or around May 4, 2018 when a certificate of incorporation was filed with the New York Secretary of State.  The certificate is signed by Dats, lists Dats as the incorporator of InStock Goodies Inc, lists Dats as an agent of InStock Goodies Inc, and does not list any other individuals as officers of InStock Goodies Inc.  InStock Goodies Inc has not filed any other corporate documents with the New York Secretary of State.  Accordingly, upon information and belief, Dats is in control of, a principal of, and responsible for InStock Goodies Inc and its actions.

26.    Herbal Brands asserts claims against Dats in both her individual capacity as well as her capacity as a corporate officer of InStock Goodies Inc.

27.    Until it conducts discovery, Herbal Brands cannot conclusively determine whether Heschel, Bichler, and Dats in their individual capacities, or all Defendants, operate the InStock Goodies Storefront.

28.    Alternatively, upon information and belief, Dats directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Herbal Brands' trademarks by InStock Goodies Inc.  Accordingly, Dats is personally liable for infringing activities of InStock Goodies Inc without regard to piercing the corporate veil.

29.    Alternatively, upon information and belief, InStock Goodies Inc follows so few corporate formalities and is so dominated by Dats that it is merely an alter ego of Dats.  This is reflected, in part, by the facts that Dats is both the incorporator and agent and InStock Goodies Inc, has filed only a single corporate document with the New York Secretary of State, and has not identified any other corporate officer or individual involved in its

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 6 -

operation. Accordingly, Herbal Brands is entitled to pierce the corporate veil of InStock Goodies Inc and hold Dats personally liable for the infringing activities of InStock Goodies Inc.[1]

30.     Herbal Brands believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Herbal Brands. Therefore, Herbal Brands sues these Defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Herbal Brands will seek leave to amend this Complaint accordingly. If Herbal Brands does not identify any such parties, it will dismiss these Defendants from this action.

31.     Defendants and, upon information and belief, multiple other individuals or entities are acting in concert as part of a scheme to sell products bearing Herbal Brands' trademarks without authorization through multiple storefronts, and are jointly responsible for the conduct complained of herein.

## JURISDICTION

32.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Herbal Brands' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125, and its claims arising under the laws of the State of Arizona are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

33.     This Court has personal jurisdiction over Defendants because they have purposefully directed and expressly aimed their tortious activities at the State of Arizona and established sufficient minimum contacts with Arizona by, among other things, advertising and selling infringing products bearing Herbal Brands' trademarks to consumers within Arizona through a highly interactive commercial website, through the regular course

---

[1] According to public records, Photoplaza Inc, Goldshop 300 Inc, Goldshop Inc, and InStock Goodies Inc have never identified a registered agent.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

of business, with the knowledge that Herbal Brands is located in Arizona and is harmed in Arizona as a result of Defendants' sales of infringing products to Arizona residents. Defendants know that Herbal Brands is located in Arizona, among other reasons, because they received cease-and-desist correspondence informing them that Herbal Brands is located in Arizona and is harmed in Arizona by their unlawful actions. Herbal Brands' claims arise out of Defendants' sales of infringing products bearing Herbal Brands' trademarks to Arizona residents through the regular course of business.

34.     Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

## VENUE

35.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Herbal Brands and its Trademarks

36.     Herbal Brands manufactures and sells a wide range of premium-quality health, wellness, fitness, and nutrition products, including vitamin, mineral, and herbal supplements, under the Herbal Clean®, Total Eclipse®, and Simply Slender® trademarks and brands ("Herbal Brands Products").

37.     Herbal Brands allows its products to be sold to end-user consumers in the United States only by Herbal Brands itself (through direct sales it makes to customers) or by its network of authorized retailers, authorized distributors, and authorized resellers who are expressly authorized by Herbal Brands to sell Herbal Brands Products (collectively "Authorized Sellers").

38.     Herbal Brands permits Authorized Sellers to sell Herbal Brands Products in approved channels only and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Herbal Brands Rules").

39.     Herbal Brands devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Herbal Brands Products only from Herbal Brands itself or from Authorized Sellers who are required to follow the quality controls and other requirements in the Herbal Brands Rules, Herbal Brands ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its family of brands.  In the highly competitive health and wellness market, quality and customer service are fundamental parts of a consumer's decision to purchase a product.

40.     To promote and protect its family of brands, Herbal Brands has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: HERBAL CLEAN® (U.S. Trademark Registration No. 2,001,460); TOTAL ECLIPSE® (U.S. Trademark Reg. No. 2,748,088); SIMPLY SLENDER LEMONMADE DIET® (U.S. Trademark Reg. No. 3,547,936); QCARBO® (U.S. Trademark Reg. No. 5,977,345); and ELIMINEX® (U.S. Trademark Registration No. 3,828,156) (collectively, the "Herbal Brands Trademarks").

41.     The registration for each of the Herbal Brands Trademarks is valid, subsisting, and in full force and effect.

42.     Further, Herbal Brands' right to use many of the Herbal Brands Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Herbal Brands received no final legal decision issued against the trademarks, and Herbal Brands timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive evidence of Herbal Brands' ownership of the marks and of its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

43.     Herbal Brands actively uses, advertises, and markets all of the Herbal Brands Trademarks in commerce throughout the United States.

44.     Consumers recognize Herbal Brands, and Herbal Clean QCarbo Detox in

- 9 -

particular, as the name associated with nutritional supplements that maintain the highest standards in labeling, ingredient safety, and product potency.

45.     Herbal Brands is known for remaining on the cutting-edge of detox and wellness supplements, and being devoted to helping its customers improve the quality of their lives.

46.     For all of these reasons, the Herbal Brands Trademarks are widely recognized by the general consuming public of the United States and Herbal Brands is recognized as the source of products bearing the Herbal Brands Trademarks.

47.     By virtue of Herbal Brands' continuous, nationwide use of the Herbal Brands Trademarks in interstate commerce since 1990, Herbal Brands owns common law rights in the Herbal Brands Trademarks as used in connection with nutritional supplements.

48.     Due to the superior quality and exclusive distribution of Herbal Brands Products, and because Herbal Brands is uniquely recognized as the source of these high quality products, the Herbal Brands Trademarks have substantial value.

### Online Marketplaces and the Challenges They Present to Herbal Brands Product Quality and Goodwill

49.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.0%.  *See* Federal Reserve Bank of St. Louis, *E-Commerce Retail Sales as a Percent of Total Sales* (February 19, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

50.     In 2020, consumers spent $861 billion on e-commerce sales, a 44% increase from 2019.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2020, United States consumers spent more than $296 billion in e-commerce sales on Amazon, a 38.6% increase from 2019.  *See* Fareeha Ali, *U.S. ecommerce grows 44% in 2020*, DIGITAL COMMERCE 360 (Jan. 29, 2021), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

51.     While online marketplaces have created a great deal of opportunity, they also

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

greatly challenge a manufacturer's ability to control the quality and safety of its products.

52.     For example, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different product if the one they initially select is damaged or has been tampered with. Instead, consumers must trust that the product they choose over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

53.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

54.     Online marketplaces are overrun by unauthorized sellers—such as Defendants—who have no relationship with or obligations to brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.    It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019,  https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

55.     Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

56.     For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at: https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller[.]"  *Id.* at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35-36.

57.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea market of fakes*, THE WASHINGTON POST Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

58.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019,  https://www.finance.senate.gov/download/the-fight-against-fakes.

59.     In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/   amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020),  *available at*  https://sec.report/Document/0001018724-20-000004/.     Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

60.     Because brand owners have no relationship with, or control over, unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the safety of consumers—particularly when, as here, a brand owner's products are ingested by consumers.

61.     The structure, construction, and user interface of online marketplaces also threaten a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

62.     When purchasing products on an online marketplace, consumers are not informed whether a seller of a product is authorized by the brand owner.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

63.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

64.     When a consumer purchases a product on a marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

65.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller who sold the product.

66.     Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews. Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

67.     Consumers place extraordinary trust in online reviews. Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers. *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 14 -

Other-Consumers/1007509.

68.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC's Bureau of Consumer Protection).

69.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised.  Online consumers, however, are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Thus, online consumers rely more on brand reputation and reviews.

70.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

71.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

**Sales of Poor Quality Herbal Brands Products on Online Marketplaces Have Caused Consumers to Write Numerous Negative Reviews of Herbal Brands Products**

72.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products and leave negative reviews on product listings.

These negative reviews injure consumer perceptions of brands' quality and reputation, as well as brands' placement in search results, ultimately causing brands to suffer damage to their goodwill and lose sales.

73.     Herbal Brands, and its family of brands, have been the subject of numerous negative reviews written by customers who purchased Herbal Brands Products of poor quality on online marketplaces.  These customers have complained of receiving products that were damaged, defective, expired, tampered with and previously opened, missing components, or of otherwise poor quality.

74.     For example, on January 14, 2021, Amazon user "brodey" complained that the packaging of the Herbal Brands Product he ordered on Amazon was "ripped up" and that his order was incomplete.



75.     On November 21, 2020, Amazon user "Joseph Luces" complained that, when the Herbal Brands Product he ordered from Amazon arrived, "the package was open" and "the pills are missing."

Joseph Luces

⭐☆☆☆☆ **Missing**
Reviewed in the United States on November 21, 2020
Verified Purchase
Literally just took it out of the box and the package was open the pills are missing

76.     On July 23, 2021, Amazon user "Kyle :)" complained that the top of an Herbal Brands Product he purchased on Amazon "was already ripped open."

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 16 -



Kyle :)

⭐☆☆☆☆ **Top was open**
Reviewed in the United States on July 23, 2020
Verified Purchase
The top was already ripped open I want my money back I'm not drinking this!

77.     On June 3, 2020, Amazon user "jason echols" complained that an Herbal Brands Product he purchased on Amazon was "old," "defective," and had a "hard substance at the bottom of the drink."  He explained that he knew the product was not supposed to have a hard substance because "[t]his was not my first time using the product" and he had had "success with the product in the past[t]."  He lamented that the product "was a waste of my money and time."



jason echols

⭐☆☆☆☆ **Product was defective and that's not cool.**
Reviewed in the United States on June 3, 2020
Verified Purchase
The product was old and they also don't allow you to return it even if that's the fact. Once I opened the bottle it was a hard substance at the bottom of the drink. I know that it does not suppose to be in the drink. This was not my first time using the product. I've had success with the product in the pass but, this one was a waste of my money and time because I can't even get a replacement bottle for a defective product.

78.     On April 23, 2020, Amazon user "OvernightAddict" complained that the Herbal Brands Product he had purchased on Amazon had been "delivered with a hole in it and the box completely soaked."



OvernightAddict

⭐☆☆☆☆ **There could be a hole in your bottle**
Reviewed in the United States on April 23, 2020
Verified Purchase
Unfortunately my 2nd bottle was delivered with a hole in it and the box completely soaked. It says I am not able to return it, so I am guessing that was $23.00 down the drain.

79.     On March 24, 2020, an Amazon customer complained that an Herbal Brands Product he purchased on Amazon arrived with a broken seal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

> Kindle Customer
>
> ⭐☆☆☆☆ **Broken seal**
> Reviewed in the United States on March 24, 2020
> Verified Purchase
> The seal was broken upon delivery. Unable to test product. Waste of money

80.     On March 3, 2020, Amazon user "Katelyn" complained that, after she purchased an Herbal Brands Product on Amazon, she received a product that was expired "by almost a full month" when it arrived.

>  Katelyn
>
> ⭐☆☆☆☆ **Expiration Date 02/16/2020**
> Reviewed in the United States on March 3, 2020
> Verified Purchase
> Product was expired when it arrived by almost a full month. Not impressed. Will be getting a refund.

81.     On July 10, 2019, Amazon user "Adam Albright" complained that an Herbal Brands Product he purchased on Amazon was "opened" and had a broken seal when he received it.

> Adam Albright
>
> ⭐☆☆☆☆ **Bottle had been tampered with..**
> Reviewed in the United States on July 10, 2019
> Verified Purchase
> When I received the product, the plastic case that the bottle came in was opened. I noticed after taking the cap off the bottle that the seal was open.

82.     On November 22, 2019, an Amazon customer complained that an Herbal Brands Product she purchased on Amazon was missing "5 tablets" that were supposed to come with the product.

> Amazon Customer
>
> ⭐☆☆☆☆ **Incomplete order**
> Reviewed in the United States on November 22, 2019
> Verified Purchase
> Had to return. It did not come with the 5 tablets.

83.     On November 30, 2018, Amazon user "Jahaziel" complained that, after he purchased an Herbal Brands Product on Amazon, he received a product that had a broken seal and "hole on the pill package."  He wrote:  "I won't use the product since it's been

1    open[.  T]his was just a waste of money."



> **Jahaziel**
> ⭐☆☆☆☆ **Don't waste your money**
> Reviewed in the United States on November 30, 2018
> Verified Purchase
>
> I open the package soon as I got the product seem like it was already open I took the top Off the bottle and I could hear air coming out like somebody tear up a little bit of the seal off . And someone poked a hole on the pill package I won't use the product since it's been open .this was just a waste of money .

7    84.    On June 17, 2018, Amazon user "Sam Molina" complained that an Herbal

8    Brands Product he purchased on Amazon arrived without any tablets, even though the

9    product was advertised as including tablets.  He also reported that his product "was open"

10   when he received it.



> **Sam Molina**
> ⭐☆☆☆☆ **Gals advertisement...doesn't come with tablets needed for it to work**
> Reviewed in the United States on June 17, 2018
> Verified Purchase
>
> The picture of the product has tablets next to it. The direction says to take the tablets with it....my order was open and there were not tablets with it....wtf?
>
> So upset
>
> 2 people found this helpful

15   85.    The foregoing reviews are only a small sample of the negative reviews of

16   Herbal Brands Products that have been posted on the Amazon platform.  These reviews,

17   which give Herbal Brands Products a 1-star rating, reduce the products' average rating and

18   harm Herbal Brands' reputation and goodwill.

19   86.    These reviews have continued to appear on the Internet following the

20   implementation of Herbal Brands' quality control program, discussed below, because many

21   online sellers are unauthorized sellers of Herbal Brands Products who are not subject to,

22   and do not follow, the quality controls that Herbal Brands requires its Authorized Sellers to

23   follow.

24   87.    Amazon does not allow product reviews to identify the seller that sold the

25   product that is the subject of the product review.  Given that Defendants are selling a high

26   volume of products bearing the Herbal Brands Trademarks on Amazon, and are not subject

27   to Herbal Brands' quality controls, however, it is likely that some of the foregoing negative

28   reviews—and the many similar reviews of Herbal Brands Products that appear on the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Amazon website—were written by customers who purchased products bearing the Herbal Brands Trademarks from Defendants' Amazon storefronts.

**Herbal Brands Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented by Online Marketplaces, Protect the Value of the Herbal Brands Trademarks, and Ensure Customers Receive the Genuine, High Quality Products They Expect from Herbal Brands**

88.     The above reviews show how sales of poor-quality Herbal Brands Products disappoint Herbal Brands' customers and cause significant harm to the reputation and goodwill of Herbal Brands and its family of brands.  To protect itself and consumers from these harms, Herbal Brands implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

89.     The goals of Herbal Brands' quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Herbal Brands Products receive products that feature all of the special characteristics and customer service that consumers have come to expect from products sold under the Herbal Brands name.  By preventing consumers from receiving poor quality products, the program protects consumers from confusion and also protects the value and goodwill associated with the Herbal Brands Trademarks.

90.     Herbal Brands' ability to exercise these quality controls is particularly important for the products it sells because consumers ingest the products and there may be health and safety risks associated with products that are expired or have not been properly inspected, stored, or handled.

91.     Herbal Brands abides by its quality control procedures for products it sells directly to consumers.  Moreover, as discussed below, Herbal Brands requires its Authorized Sellers to abide by the quality control requirements and has policies and procedures in place to audit its Authorized Sellers to ensure that they comply.

92.     Herbal Brands' ability to exercise its quality controls is essential to the integrity, safety, and quality of Herbal Brands Products, as well as the value of the Herbal

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Brands Trademarks and other intellectual property.

**Authorized Sellers May Sell Herbal Brands Products Only Through**
**Specific Channels and Must Adhere to Herbal Brands'**
**Quality Control and Customer Service Requirements**

93.    Herbal Brands maintains strict quality controls over Herbal Brands Products by allowing Herbal Brands Products to be purchased by end-user consumers only from Herbal Brands itself or from Authorized Sellers.

94.    All of Herbal Brands' Authorized Sellers are permitted to sell Herbal Brands Products only in certain channels and are required to abide by the Herbal Brands Rules.

95.    The Herbal Brands Rules limit to whom and where Authorized Sellers may sell Herbal Brands Products.  To prevent persons outside of Herbal Brands' quality controls from acquiring and reselling Herbal Brands Products, the Herbal Brands Rules prohibit Authorized Sellers from selling Herbal Brands Products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are permitted to sell Herbal Brands Products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

96.    Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling Herbal Brands Products on any website they do not themselves own and operate, unless they first apply for and receive written approval from Herbal Brands.

97.    These restrictions are essential to Herbal Brands' ability to exercise its quality controls over Herbal Brands Products because they prevent unauthorized sellers from obtaining and reselling Herbal Brands Products and allow Herbal Brands to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Herbal Brands can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Herbal Brands is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

98.    In addition to restricting where and how Authorized Sellers can sell Herbal

Brands Products, the Herbal Brands Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, storage, and handling of Herbal Brands Products.

99. To ensure that customers receive the genuine and high quality products they expect from Herbal Brands, the Herbal Brands Rules require Authorized Sellers to regularly inspect all Herbal Brands Products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory. Authorized Sellers are prohibited from selling damaged or defective products, and are required to report any discovered defects to Herbal Brands to assist it with identifying any product quality issues.

100. Authorized Sellers must also regularly inspect their inventory for any products that are expired or within 90 days of expiration ("Not-Current Products"), and not sell any Not-Current Products to consumers.

101. The Herbal Brands Rules also require that Authorized Sellers store Herbal Brands Products in a cool dry place, away from direct sunlight, and in accordance with other guidelines issued by Herbal Brands. These requirements help ensure that Herbal Brands Products are stored properly and are not damaged prior to being shipped to the consumer. Authorized Sellers are also required to sell inventory in a "first-in, first-out" basis, selling older inventory before newer inventory of the same product.

102. To avoid consumer confusion and ensure that customers receive genuine Herbal Brands Products, Authorized Sellers must sell Herbal Brands Products in their original packaging and are prohibited from relabeling, repackaging, or altering Herbal Brands Products or any accompanying label, literature, or safety-related information, unless instructed by Herbal Brands. Authorized Sellers are prohibited from reselling any products that have been returned, opened, or repackaged.

103. Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Herbal Brands Products, including any serial number, UPC code, batch or lot code, or other identifying information.

104. The Herbal Brands Rules give Herbal Brands the right to monitor and audit

- 22 -

Authorized Sellers by inspecting their facilities and records relating to Herbal Brands Products to ensure their compliance with Herbal Brands' quality control requirements. During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of all their sources of all Herbal Brands Products.

105.   Authorized Sellers also must cooperate with Herbal Brands with respect to any product recall or other consumer safety information dissemination effort conducted by Herbal Brands regarding Herbal Brands Products, and must cooperate with any product tracking implemented by Herbal Brands.

106.   The Herbal Brands Rules also require Authorized Sellers to provide various customer service requirements.

107.   For example, Authorized Sellers must familiarize themselves with the features of all Herbal Brands Products kept in their inventory so that they can advise customers on the selection and safe use of Herbal Brands Products.

108.   Both before and after the sale of Herbal Brands Products, Authorized Sellers must provide prompt replies to all questions and concerns from consumers regarding Herbal Brands Products and their safe use.

109.   Herbal Brands' quality control and customer service requirements are legitimate and substantial and have been implemented so that Herbal Brands can control the quality of goods manufactured and sold under the Herbal Brands Trademarks, to protect consumers as well as the value and goodwill associated with the Herbal Brands Trademarks.

110.   Herbal Brands' quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether an Herbal Brands Product that they were considering buying was being sold by an Authorized Seller who is subject to Herbal Brands' quality control and customer service requirements, or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Herbal Brands' quality controls and over whom Herbal Brands is unable to exercise its quality controls.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Given the Flood of Poor Quality Products Being Sold Online and Consumers'
Inability to Inspect Such Products Before Purchase, Herbal Brands Imposes
Additional Requirements on Its Authorized Sellers Who Sell Online**

111.   As shown in consumer reviews cited above (¶¶ 74-84), Herbal Brands products sold online are more susceptible to quality and authenticity problems as consumers cannot see products before they buy them.  These problems are especially severe on online marketplaces like Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

112.   Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sales, Herbal Brands imposes additional quality control requirements on all of its Authorized Sellers who sell Herbal Brands Products online.

113.   The Herbal Brands Rules allow Authorized Sellers to sell Herbal Brands Products to end-user consumers only through "Permissible Public Websites" and "Authorized Websites."  These rules allow Herbal Brands to oversee all Authorized Sellers who sell Herbal Brands Products online.

114.   A "Permissible Public Website" is a website that:  (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name, and (2) does not give the appearance that it is operated by Herbal Brands or any third party. Only a small subset of Herbal Brands' Authorized Sellers are permitted to sell Herbal Brands Products on Permissible Public Websites; many Authorized Sellers are not permitted to do so even if they own and operate a website that meets the criteria of a Permissible Public Website.

115.   Authorized Sellers must receive prior written approval from Herbal Brands before they can sell Herbal Brands Products on any website that does not meet the criteria of a Permissible Public Website.  To obtain Herbal Brands' approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Herbal Brands Products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Herbal Brands that includes review of

their business operating business record, and online review history.  A website that Herbal Brands permits an Authorized Seller to use through this process is called an "Authorized Website."

116.    Online marketplaces, including Amazon, do not qualify as "Permissible Public Websites" because they are operated by third parties rather than any Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Herbal Brands and specifically approved to sell on an online marketplace.

117.    The Herbal Brands Rules impose numerous additional requirements on Authorized Sellers who sell Herbal Brands Products on Permissible Public Websites or Authorized Websites.

118.    For example, Authorized Sellers that sell on Permissible Public Websites or Authorized Websites (collectively, "Authorized Online Sellers"), must use images of Herbal Brands Products that are provided or approved by Herbal Brands and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Herbal Brands Product they do not carry in inventory.

119.    The Herbal Brands Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Herbal Brands or another third party.  These requirements allow consumers of Herbal Brands Products to understand the nature of the seller from whom they are purchasing, and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Herbal Brands to protect the public from the sale of poor quality or counterfeit Herbal Brands Products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

120.    Authorized Online Sellers who sell Herbal Brands Products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Herbal Brands.  At Herbal Brands' request, Authorized Online Sellers must

provide access to, and copies of, all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Herbal Brands Products.

121.   Unless otherwise approved by Herbal Brands, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Herbal Brands Products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Herbal Brands Products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Herbal Brands' quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Herbal Brands' quality controls.

122.   Authorized Online Sellers must comply with all applicable data security, accessibility, and privacy requirements.

123.   All websites where Authorized Online Sellers sell Herbal Brands Products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also:  (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Herbal Brands upon request; and (iii) cooperate with Herbal Brands in investigating negative online reviews related to sales of Herbal Brands Products.

124.   The additional quality control requirements that Herbal Brands imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Herbal Brands to carefully control the quality of Herbal Brands Products that are sold online, and quickly address any quality issues that arise.

125.   Herbal Brands' additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Herbal Brands Products online receive genuine, high-quality Herbal Brands Products that abide by Herbal Brands' quality controls. Consumers purchasing Herbal Brands Products online would find it relevant to their purchasing decision to know whether the product they are buying is vended by an

Authorized Online Seller who is subject to, and abides by, Herbal Brands' quality controls.

**Herbal Brands Monitors and Audits Its Authorized Online Sellers to Ensure They Comply With Its Quality Control Requirements**

126.    Herbal Brands regularly audits its Authorized Online Sellers and monitors Authorized Websites and Permissible Public Websites to ensure that Authorized Online Sellers are adhering to Herbal Brands' quality control requirements.  Herbal Brands carries out its auditing and monitoring actions pursuant to an internal program called the Herbal Brands Online Quality Control Program ("Auditing Program").

127.    As part of its Auditing Program, Herbal Brands examines every Authorized Website and a rotating sample of Permissible Public Websites each month to ensure that the Authorized Online Sellers who sell through the websites are complying with the Herbal Brands Rules.  During these examinations, Herbal Brands checks to make sure that, among other requirements, Authorized Websites and Permissible Public Websites:  (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name, and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Herbal Brands or a third party; (iii) do not display any content that could be detrimental to Herbal Brands; (iv) do not make any representations regarding Herbal Brands Products that are misleading; (v) exclusively contain images of Herbal Brands Products and product descriptions that are supplied or authorized by Herbal Brands and are up-to-date; and (vi) have a mechanism through which customers can provide feedback.

128.    Herbal Brands also periodically inspects online reviews of Herbal Brands Products and Authorized Online Sellers that appear on Authorized Websites and Permissible Public Websites.  If Herbal Brands discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Herbal Brands Products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Herbal Brands communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews,

take any necessary corrective action, and secure the removal of negative reviews, if possible.

129.   Herbal Brands also regularly conducts test purchases of an Herbal Brands Product from every Authorized Website and a rotating sample of Permissible Public Websites.  If Herbal Brands discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites and Permissible Public Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Herbal Brands communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

130.   If Herbal Brands discovers that an Authorized Online Seller is selling Herbal Brands Products of poor quality or otherwise not adhering to Herbal Brands' quality control or customer service requirements, Herbal Brands conducts an investigation to determine the source of the problem.  The Herbal Brands Rules require that Authorized Online Sellers cooperate with Herbal Brands' investigation, permit Herbal Brands to inspect their facilities and records relating to Herbal Brands Products, and disclose all information about where they obtained Herbal Brands Products.  Based on what its investigation reveals, Herbal Brands has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Herbal Brands Products.

**Genuine Herbal Brands Products Come with Herbal Brands' Satisfaction Guarantee; the Products Sold by Defendants Do Not**

131.   Herbal Brands Products that are purchased from Herbal Brands directly or from an Authorized Seller come with Herbal Brands' 45-Day Satisfaction Guarantee ("Satisfaction Guarantee").  Under the Satisfaction Guarantee, U.S. customers who are not completely satisfied with a product they purchased from Herbal Brands or an Authorized Seller may request a full refund of the purchase price within 45 days from the order date.

132.   Herbal Brands extends the Satisfaction Guarantee only to products that were

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

sold by sellers that are subject to Herbal Brands' quality controls. Because products sold by unauthorized sellers are not subject to Herbal Brands' quality controls, and Herbal Brands cannot ensure the quality of such products, Herbal Brands does not extend the Satisfaction Guarantee to products sold by unauthorized sellers, including Defendants. The full terms of the Satisfaction Guarantee for products sold under Herbal Brands' Herbal Clean®, Total Eclipse®, and Simply Slender® brands can be viewed at https://herbalclean.com/satisfaction-guarantee, https://totaleclipsedetox.com/money-back-guarantee, and https://simplyslenderdiet.com/money-back-guarantee, respectively.

133.    The Satisfaction Guarantee is a material component of genuine Herbal Brands Products. Consumers who purchase Herbal Brands Products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Herbal Brands stands behind the product, and that they can receive a refund from Herbal Brands if they are dissatisfied.

134.    Consumers would find it material and relevant to their purchasing decision to know whether an Herbal Brands Product they are considering buying is covered by the Satisfaction Guarantee. If a consumer knew a product did not come with the Satisfaction Guarantee, the consumer would be less likely to purchase the product.

**Defendants Are Neither Authorized Sellers nor Authorized Online Sellers and Are Illegally Selling Products Bearing the Herbal Brands Trademarks**

135.    In addition to auditing its Authorized Online Sellers, due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the Herbal Brands Trademarks by unauthorized Internet sellers, Herbal Brands also actively monitors the sale of Herbal Brands Products online by all sellers.

136.    Through these efforts and extensive investigation, Herbal Brands discovered that its products are being sold on Amazon by multiple individuals and entities and through multiple storefronts as part of an interconnected scheme of sellers.

137.    As detailed in the following Paragraphs, multiple defendants are acting in concert as part of this scheme to sell products bearing Herbal Brands' trademarks without

authorization through multiple storefronts. All of the Defendants are acting in concert and are jointly responsible for the conduct complained of herein.

138. In the course of this monitoring, Herbal Brands discovered a high volume of products bearing the Herbal Brands Trademarks being sold illegally by Defendants on Amazon under the storefront name "GOLDSHOP."

139. Through its investigation, Herbal Brands determined that Defendants are responsible, at least in part, for the operation of the GOLDSHOP Storefront. Discovery may reveal that additional entities and/or individuals also assist in the operation of the GOLDSHOP Storefront and are responsible for the conduct complained of herein.

140. Defendants currently list their business name on their GOLDSHOP Storefront as Photoplaza Inc. According to public records, Heschel is an agent of Photoplaza Inc. Defendants also list their business address on their GOLDSHOP Storefront as 130 Lee Ave, #300, Brooklyn, New York 11211 (the "130 Lee Ave. private mailbox"). This address is a post office box located within a private mail facility.

141. Previously, Defendants used to list their business name on their GOLDSHOP Storefront as Goldshop 300 Inc. After receiving a cease-and-desist letter from Herbal Brands on February 19, 2021 that was mailed to Goldshop 300 Inc and Bichler, Defendants changed the business name listed on the GOLDSHOP Storefront from "Goldshop 300 Inc" to "Photoplaza Inc." Defendants did not change the business address listed on the GOLDSHOP Storefront.

142. According to public records, Goldshop 300 Inc also lists the 130 Lee Ave. private mailbox as its business address. Additionally, public records list Bichler as an agent of Goldshop 300 Inc.

143. Public records reveal that Goldshop Inc also lists as its business address the 130 Lee Ave. private mailbox. According to public records, Dats is an agent of Goldshop Inc.

144. Public records reveal that Dats is also an agent and incorporator of InStock Goodies Inc.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

145.   In the course of its monitoring, Herbal Brands also discovered a high volume of products bearing the Herbal Brands Trademarks being sold illegally by Defendants on Amazon under the storefront name "InStock Goodies."

146.   Through its investigation, Herbal Brands determined that Defendants also are responsible, at least in part, for the operation of the InStock Goodies Storefront.  Discovery may reveal that additional entities and/or individuals also assist in the operation of the InStock Goodies Storefront and are responsible for the conduct complained of herein.

147.   Defendants currently list their business name on their InStock Goodies Storefront as "InStock Goodies inc."

148.   Additionally, Herbal Brands discovered that InStock Goodies Inc has imported products to the address 1808 55th Street, Brooklyn, New York 11204 (the "1808 55th Street address") – the same business address Photoplaza Inc. originally listed in its Certificate of Incorporation and Heschel's home address.

149.   Defendants also changed the business information associated with their Amazon storefronts to avoid detection by Herbal Brands. *See supra* ¶ 141.

150.   Defendants are acting in concert as part of a coordinated scheme to sell products bearing Herbal Brands' trademarks without authorization through multiple storefronts.  As a result, all of the defendants are acting in concert and are jointly responsible for the conduct complained of herein.

151.   Defendants are not Authorized Sellers of Herbal Brands Products and are not subject to, and do not comply with, Herbal Brands' Authorized Seller requirements, or the Herbal Brands Rules.

152.   Defendants are also not Authorized Online Sellers of Herbal Brands Products and do not comply with the additional quality control requirements that Herbal Brands imposes on its Authorized Online Sellers.

153.   Defendants have not applied to be Authorized Online Sellers of Herbal Brands Products, and Herbal Brands has not approved Defendants to be Authorized Online Sellers of Herbal Brands Products.

154.   Defendants could not be approved as an Authorized Online Seller because they do not comply with Herbal Brands' requirements.

155.   Upon information and belief, Defendants also do not comply with Herbal Brands' requirements because they do not operate an appropriately registered and recognized business that satisfies the credit, sales, history, and facility requirements that Herbal Brands requires of its Authorized Online Sellers who it would permit to sell on Amazon.

156.   Defendants also do not comply with Herbal Brands' requirements because they do not have an acceptable online review history or business operating record.  As set forth below, many consumers have complained that Defendants provided poor customer service and sold products that were fake, damaged, defective, tampered with, previously opened, or of otherwise poor quality.

157.   Despite not being approved as Authorized Sellers of Herbal Brands Products, and not meeting the requirements Herbal Brands imposes on its Authorized Sellers, Defendants have sold, and continue to sell, a high volume of products bearing the Herbal Brands Trademarks on their GOLDSHOP and InStock Goodies Storefronts.

**Defendants Are Selling Damaged, Defective, Tampered With, Previously Opened, and Other Poor Quality Products and Are Providing Poor Customer Service**

158.   Defendants have sold numerous products through their GOLDSHOP and InStock Goodies Storefronts that are expired, repackaged, damaged, defective, unpackaged, tampered with, or of otherwise poor quality.  Evidence of these sales can be seen by viewing reviews that customers have written of Defendants' GOLDSHOP and InStock Goodies Storefronts.  Customer reviews also show that Defendants are providing extremely poor customer service, including improperly packaging products, refusing to provide refunds for incorrect orders, and failing to address numerous communications from dissatisfied customers.

159.   For example, on February 21, 2020, Amazon user "James P. Lydon" complained that a product he purchased from Defendants' InStock Goodies Storefront was

- 32 -

already expired when he received it.  He wrote: "These sellers are dirtbags . . . . Don't buy from these people."

> ★☆☆☆☆   *"These sellers are dirtbags. I put my order in Feb 2020 and they sent me a bottle tat expired on Jan 2020. Dont't buy from these people."*
> By James P. Lydon on February 21, 2020.

160.    On March 19, 2020, Amazon user "nikkih" complained that a product he purchased from Defendants' InStock Goodies Storefront "only came with 2 instead of 3 and did not come in a retail package.  So I have no idea if it is expired or how to use it."

> ★☆☆☆☆   *"Item only came with 2 instead of 3 and did not come in a retail package. So I have no idea if it is expired or how to use it."*
> By nikkih on March 19, 2020.

161.    On April 16, 2020, Amazon user "Joseph" reported that Defendants, through their InStock Goodies Storefront, sent him expired products that also differed from what Defendants had advertised on their Amazon storefront.  He explained that, after he ordered "low dose aspirin for my 90 yr old mom," Defendants did not send him "one bottle of 365 [tablets]" as he had ordered and instead sent "three EXPIRED BOTTLES of 150 each, so NOT as described and EXPIRED A DOUBLE NO NO."  He added that: "THEY HAVE A NO RETURN POLICY . . . . THIS IS TERRIBLE especially at this time of social distancing."

> ★☆☆☆☆   *"I ordered these low dose aspirin for my 90 yr old mom. Instead of receiving one bottle of 365 tables, I received three EXPIRED BOTTLES of 150 each, so NOT as described and EXPIRED A DOUBLE NO NO. AND THEY HAVE A NO RETURN POLICY ON THIS, NOT ELIGIBLE FOR RETURN. SO PLEASE REFUND/CREDIT MY FORM OF PAYMENT. THIS IS TERRIBLE especially at this time of social distancing!"*
> Read less
> By Joseph on April 16, 2020.

162.    On November 13, 2020, Amazon user "Kelpie" complained that the product he purchased from Defendants' InStock Goodies Storefront was expired.

> ★☆☆☆☆   *"The item had EXPIRED"*
> By Kelpie on November 13, 2020.

163.    On May 1, 2020, Amazon user "Fred Mitchell" complained that he had ordered the same product from Defendants' InStock Goodies Storefront two times, and on both occasions "the tubes had medicine leaking out of them when they arrived."  He wrote that he "didn't trust that it hadn't been tampered with."

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

> *"Tried to order this twice and the tubes had medicine leaking out of them when they arrived. I didn't trust that it hadn't been tampered with."*
> By Fred Mitchell on May 1, 2020.

164.    On May 9, 2020, Amazon user "Joseph Skirim" asked Defendants, within a seller review of Defendants' InStock Goodies Storefront: "WHY did this product arrive without the box and instructions?"  Defendants did not reply to the review.

> *"WHY did this product arrive without the box and instructions? IF it is not an official product and I don't hear from you proving this I will return it."*
> By Joseph Skirim on May 9, 2020.

165.    On April 14, 2020, an Amazon customer complained that, after she ordered six tubes from Defendants' InStock Goodies Storefront, she received a package in which "3 of the 6 tubes . . . were opened and empty.  Only 3 were useable."

> *"3 of the 6 tubes in the package were opened and empty. Only 3 were useable. I would like to see about a replacement for this item."*
> By Amazon Customer on April 14, 2020.

166.    On February 23, 2020, Amazon user "Traveler" complained that, after he ordered a hair dryer product from Defendants' InStock Goodies Storefront that was listed as "new," he received a product box that was "sticky/bent" and a hair dryer that "had fuzz and lint in the vent already!, scratched, [and] missing the 'warning' label on cord as it was sticky where it was removed."  He stated: "[c]learly they are selling returns/refurbished items for full, new price.  Will never use them again!"

> *"Ordered a NEW $30 hair dryer but a USED one was sent. Product box was sticky/beat up, hair dryer had fuzz and lint in the vent already!, scratched, missing the "warning" label on cord as it was sticky where it was removed. Clearly they are selling returns/refurbished items for full, new price. Will never use them again! Return has been requested."*
> Read less
> By Traveler on February 23, 2020.

167.    On September 11, 2020, Amazon user "SO" complained that the product he purchased from Defendants' InStock Goodies Storefront was "refurbished, not new. It came in a plastic bag" and not in the manufacturer's packaging.

> *"Item is refurbished, not new. It came in a plastic bag. I had purchased this same item from staples, and it came in a manufacturer's box. This one is in plastic bag."*
> Read less
> By SO on September 11, 2020.

168.    On June 13, 2020, Amazon user "Eric" complained that, after he purchased a product from Defendants' InStock Goodies Storefront, he received an "empty bottle and the option to request a refund or report item does not work."

> *"I received an empty bottle and the option to request a refund or report item does not work."*
> By Eric on June 13, 2020.

169.   On November 2, 2020, Amazon user "Anonymous" complained that he received from Defendants' InStock Goodies Storefront a bottle of soap with "[n]o nozzle."

> *"No nozzle in the soap - disappointing!"*
> By Anonymous on November 2, 2020.

170.   On September 25, 2020, Amazon user "Betty U." complained that she received from Defendants' InStock Goodies Storefront "[l]eaking old bottles."

> *"Leaking old bottles,"*
> By Betty U. on September 25, 2020.

171.   On September 20, 2020, Amazon user "Colleen M." complained that the product she purchased from Defendants' InStock Goodies Storefront "was only half empty due to leakage" and was packaged in a plastic bag.

> *"One bottle was only half empty due to leakage, definitely not 41 oz in the bottle, which I'm guessing they know it would happen as it was package in plastic bag so it would soak through the box. I didn't get my monies worth for $25 per bottle. Don't think I'll order again. If I could get a refund for half filled bottle that would make up for not getting a full bottle of detergent."*
> Read less
> By Colleen M. on September 20, 2020.

172.   On September 16, 2020, Amazon user "Lorena P." complained that the order she placed through Defendants' InStock Goodies Storefront was "[m]issing product and very damage[d]."

> *"Missing product and very damage."*
> By Lorena P. on September 16, 2020.

173.   On September 11, 2020, Amazon user "Michael c." complained that the order he placed through Defendants' InStock Goodies Storefront was "missing 3 containers" and that he contacted Defendants but did not receive a response or resolution.

> *"The order is missing 3 containers as the item description listed 2 count. Seller was contacted but have not received a response or resolution. Very disappointing."*
> Read less
> By Michael c. on September 11, 2020.

174.   On September 8, 2020, Amazon user "CHRISTOPHER F." complained that the products he ordered from Defendants' InStock Goodies Storefront were poorly packaged and resulted in "the lids being off and all the containers were wet and label pe[e]ling off."

> ★☆☆☆☆   *"When I got my order they just put all the containers in one box with no packing and as the box was shipped around the product when everywhere , If it was not for the fact that I needed it I would have sent it back but we have not had this product for over 6 months. So I decided to keep it and deal with the lids being off and all the containers were wet and labels pealing off "*
> Read less
>
> By CHRISTOPHER F. on September 8, 2020.

175.   On April 19, 2020, Amazon user "Frances" complained that, after she ordered a product from Defendants' InStock Goodies Storefront, she received "a completely different and cheaper product, and not the product that is pictured." She noted that she tried purchasing the product from Defendants a second time, but "[a]gain, the item was the wrong product."

> ☆☆☆☆☆   *"This item is described as scleral lens handler and the image provided is for the handler. The handler is meant for insertion and removal. The item we received was the scleral lens remover, which is a completely different and cheaper product, and not the product that is pictured. We returned the original purchase and a second item was sent. Again, the item was the wrong product."*
> Read less
>
> By Frances on April 19, 2020.

176.   On June 10, 2020, Amazon user "fmhenley52" complained that, after she ordered a product from Defendants' InStock Goodies Storefront, Defendants "cancelled my order (that I still wanted) giving the reason as 'Customer cancelled order' (I did NOT!)." She stated: "I bet they wanted to sell these disinfecting wipes for more $$ to someone else." She described Defendants as "[t]he worst lying reseller ever," and encouraged other consumers to "NEVER do business with them…NOT TRUSTWORTHY!"

> ☆☆☆☆☆   *"The worst lying reseller ever. They cancelled my order (that I still wanted) giving the reason as "Customer cancelled order" (I did NOT). Their ridiculous story: "It was on the way to our warehouse in our truck, but now we can't deliver for reasons beyond our control." I bet they wanted to sell these disinfecting wipes for more $$ to someone else. NEVER do business with them...NOT TRUSTWORTHY!"*
> Read less
>
> By fmhenley52 on June 10, 2020.

177.   On June 4, 2020, Amazon user "Brian" complained that, after he ordered a product from Defendants' InStock Goodies Storefront, "[t]he item never showed, Was never shipped, and request for refunds or any communication have failed. No response to messages! 0 stars in reality."

> ★☆☆☆☆   *"The item never showed, Was never shipped, and request for refunds or any communication have failed. No, response to messages! 0 Stars in reality. "*
> By Brian on June 4, 2020.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

178.   On November 10, 2020, Amazon user "Vicky" complained that Defendants chose "to ignore my attempts to contact them."

> ★☆☆☆☆   *"Sell has chosen to ignore my attempts to contact them."*
> By Vicky on November 10, 2020.

179.   On October 1, 2020, Amazon user "Kiyon" complained that he never received a refund from Defendants after placing an order through their InStock Goodies Storefront.

> ★☆☆☆☆   *"I didn't receive my refund."*
> By Kiyon on October 1, 2020.

180.   On April 2020, Amazon user "Elizabeth" complained that, after she ordered "a bottle of 150 pills" from Defendants' InStock Goodies Storefront, she received "a bottle of 32 pills."

> ★☆☆☆☆   *"I received a bottle of 32 pills. I ordered a bottle of 150 pills."*
> By Elizabeth on April 14, 2020.

181.   On November 7, 2020, Amazon user "MJJ" complained that he received the incorrect quantity of product from Defendants' InStock Goodies Storefront on two separate occasions wans was "[m]issing 900 wipes with each order."

> ★☆☆☆☆   *"The description said 1,000 wipes. I received1 box of 100. I returned and got a replacement and again got 1 box of 100. Missing 900 wipes with each order. I SHOUDL HAVE KNOWN --SEEING SOME OF THE OTHER FEEDBACK. DO NOT ORDER FROM THIS COMPANY. They charged d me $42 for 1 box of 100. YOIU WILL NOT GET WHAT YOU ORDERED. Order from somewhere else."*
> Read less
> By MJJ on November 7, 2020.

182.   On September 13, 2020, Amazon user "Pmar400" complained that Defendants, through their InStock Goodies Storefront, participated in price gauging and false advertising, and were "taking advantage of people during a pandemic."

> ★☆☆☆☆   *"You can't sell 4 packages of wipes for $40 when the normal prices is $18.99 for 8 packages. This is price gauging and false advertising since it stated 4 boxes, shame on this seller taking advantage of people during a pandemic"*
> Read less
> By Pmar400 on September 13, 2020.

- 37 -

183.   Defendants' GOLDSHOP Storefront suffers from similar negative reviews. For example, on August 1, 2019, Amazon user "Shelley Berg" complained that the product she purchased from Defendants "was dented and torn . . . looked like it came from a garage sale. . . . Will not buy from this seller again."

> ⭐⭐☆☆☆  *"Packaging was dented and torn... looked like it came from a garage sale.. embarrassing to give as gift. Short on time so had to keep items. Will not buy from this seller again. "*
> Read less
> By Shelley Berg on August 1, 2019.

184.   Similarly, on January 17, 2020, Amazon customer "Lorna Horton" complained that the product she purchased from Defendants was missing the lid.

> ⭐☆☆☆☆  *"Missing lid "*
> By Lorna Horton on January 17, 2020.

185.   These reviews are only a sample of the negative reviews customers have written about Defendants and their GOLDSHOP and InStock Goodies Storefronts on Amazon.

186.   These types of complaints about Defendants are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers. Herbal Brands allows its products to be sold only by Authorized Sellers who are subject to, and must follow, the quality control and customer service requirements in the Herbal Brands Rules to prevent customers who purchase Herbal Brands Products from suffering experiences like those described in the above complaints about Defendants.

**Defendants Are Not Subject to, Do Not Abide by, and Interfere with Herbal Brands' Quality Controls and Customer Service Requirements**

187.   Defendants do not abide by Herbal Brands' quality control and customer service requirements that Herbal Brands requires Authorized Sellers to follow.

188.   Defendants do not comply with Herbal Brands' quality control requirements because they have not provided Herbal Brands with their business information, nor given Herbal Brands an opportunity to vet them to determine if they meet Herbal Brands' high standards for what it demands of its Authorized Sellers who sell Herbal Brands Products on Amazon.   Instead, Defendants sell on Amazon without Herbal Brands' authorization or

oversight.

189.   Defendants directly violate Herbal Brands' quality controls, among many other ways, by failing to completely and accurately identify themselves on their online storefronts, instead relying on an ever shifting series of shell companies to avoid detection. For example, Defendants do not accurately list their business name on the GOLDSHOP Storefront.  They list their business name as "PHOTOPLAZA INC" and their business address as the 130 Lee Ave. private mailbox, which is associated with Goldshop 300 Inc, and not an address Photoplaza Inc has registered with the New York Secretary of State.

190.   Additionally, Defendants do not accurately list their address on the InStock Goodies Storefront.  Defendants list their business name as "InStock Goodies Inc" and their business address as 4403 15th Ave., Brooklyn, New York 11219.  However, according to public records, the business address associated with InStock Goodies Inc is 1352 42nd St., Brooklyn, New York 11219.  Defendants likewise changed the New York Secretary of State registration of InStock Goodies Inc to remove Dats' name, ostensibly to blur the connection between Dats and the storefronts.

191.   Defendants also do not provide customer feedback to Herbal Brands that relates to their sales of products bearing the Herbal Brands Trademarks or cooperate with Herbal Brands in investigating negative online reviews relating to their sales of products bearing the Herbal Brands Trademarks, as Authorized Online Sellers are required to do. These actions prevent Herbal Brands from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Herbal Brands Trademarks, such as the consumer complaints discussed above.

192.   Defendants also do not comply with Herbal Brands' quality control requirements—and interfere with Herbal Brands' quality controls—because they:  (i) have not disclosed to Herbal Brands where they acquire products that bear the Herbal Brands Trademarks; and (ii) have not given Herbal Brands the right to audit and inspect their facilities and records.  As a result, Herbal Brands cannot confirm that Defendants are not selling counterfeit products or determine if any products Defendants are selling, or have

sold, are subject to a recall or consumer-safety information effort.  Herbal Brands also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling, or have sold, in the past.

193.   Customer review of Defendants' GOLDSHOP and InStock Goodies Storefronts show that Defendants have sold numerous products that are repackaged, damaged, defective, unpackaged, tampered with, or of otherwise poor quality.  *See, e.g., supra* ¶¶ 159-184.  Thus, upon information and belief, Defendants are not carrying out the quality-control inspection, storage, or handling requirements that Herbal Brands requires Authorized Sellers to follow for Herbal Brands Products.  Instead, Defendants are selling products bearing the Herbal Brands Trademarks to consumers that are repackaged, damaged, defective, unpackaged, tampered with, or of otherwise poor quality, rather than removing such products from their inventory.  These sales cause customers to write highly negative reviews of Herbal Brands Products in which they complain of receiving poor quality products, which harm Herbal Brands' reputation and hurt the placement of Herbal Brands Products in search results

194.   Defendants' failure to abide by the Herbal Brands Rules prevents Herbal Brands from exercising control over the quality of products Defendants sell bearing the Herbal Brands Trademarks.  Unlike with its Authorized Online Sellers that Herbal Brands monitors through its Auditing Program, Herbal Brands cannot monitor or audit Defendants to ensure they are complying with its quality controls, or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

195.   In addition to failing to comply with Herbal Brands' quality control requirements, Defendants also do not comply with Herbal Brands' customer service requirements.

196.   Defendants do not comply with Herbal Brands' customer service requirements because they are not qualified or trained to accurately describe, demonstrate, and sell the Herbal Brands Products in their inventory or advise customers on the selection and safe use of Herbal Brands Products.

197. Customer reviews of Defendants' Amazon storefronts also show that Defendants have provided extremely poor customer service, including sending improperly packaged products, refusing to provide refunds for incorrect orders, and failing to address numerous communications from dissatisfied customers. *See*, *e.g., supra* ¶¶ 175-179. These reviews show that Defendants are not providing the quality customer support that Herbal Brands requires its Authorized Sellers to provide to consumers who purchase Herbal Brands Products.

**Defendants Are Infringing the Herbal Brands Trademarks by Selling Products Bearing the Herbal Brands Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Herbal Brands' Quality Control and Customer Service Requirements**

198. For all of the reasons set forth above, the products Defendants sell bearing the Herbal Brands Trademarks fail to adhere to the extensive and legitimate quality controls that Herbal Brands exercises over products bearing the Herbal Brands Trademarks to protect consumers and its brand goodwill.

199. The products sold by Defendants bearing the Herbal Brands Trademarks are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements.

200. Because the products Defendants sell are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements, the products Defendants sell are materially different from genuine Herbal Brands Products.

201. Because the products Defendants sell are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements, the products Defendants sell are not genuine Herbal Brands Products.

202. Defendants' unauthorized sale of products bearing the Herbal Brands Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Herbal Brands Products when, in fact, they are not.

203. Defendants' unauthorized sale of products bearing the Herbal Brands

1    Trademarks infringes the Herbal Brands Trademarks and diminishes their value.

2    204.   Despite these facts, Defendants have sold, and continue to sell, products

3    bearing the Herbal Brands Trademarks through their Amazon storefronts without Herbal

4    Brands' consent.

**Defendants Are Infringing the Herbal Brands Trademarks by**
**Selling Products Bearing the Herbal Brands Trademarks That**
**Do Not Come with the Satisfaction Guarantee**

7    205.   As set forth above, genuine Herbal Brands Products purchased from Herbal

8    Brands, or from Authorized Sellers that comply with Herbal Brands' quality controls, come

9    with Herbal Brands' Satisfaction Guarantee.

10   206.   Because Defendants are not Authorized Sellers of Herbal Brands Products

11   and do not comply with Herbal Brands' quality controls, the products they sell bearing the

12   Herbal Brands Trademarks do not come with the Satisfaction Guarantee.

13   207.   Because the products Defendants sell do not come with the Satisfaction

14   Guarantee, they are materially different from genuine Herbal Brands Products.

15   208.   Defendants' unauthorized sale of products bearing the Herbal Brands

16   Trademarks is likely to, and does, create customer confusion because customers who

17   purchase products bearing the Herbal Brands Trademarks from Defendants believe they are

18   purchasing genuine Herbal Brands Products that come with the Satisfaction Guarantee

19   when, in fact, they are not.

**Defendants Are Engaging in False Advertising by Falsely Representing That the**
**Products They Sell Come with the Herbal Brands Satisfaction Guarantee**

22   209.   In addition to infringing on the Herbal Brands Trademarks, Defendants are

23   also falsely advertising that the products they sell come with the Herbal Brands Satisfaction

24   Guarantee.

210.    Defendants' Amazon product listings for Herbal Brands Products state that the products are covered by the Herbal Brands Satisfaction Guarantee.  For example, Defendants are listing the following product that specifically states that it comes with the Herbal Brands Satisfaction Guarantee:





211.    As set forth above, the products Defendants sell do not come with the Herbal Brands Satisfaction Guarantee.  Thus, by representing to consumers that the products they sell come with the Herbal Brands Satisfaction Guarantee, Defendants are falsely advertising the products they are selling.

**Herbal Brands Has Attempted to Stop Defendants' Illegal Sales, but Defendants Continue to Willfully Engage in Their Illegal Actions**

212.    After  Herbal  Brands  discovered  products  bearing  the  Herbal  Brands

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Trademarks being sold illegally on the GOLDSHOP and InStock Goodies Storefronts, Herbal Brands conducted an investigation to determine the operators of the storefronts.

213.   Through its investigation, Herbal Brands determined that Defendants are responsible, at least in part, for the operation of the GOLDSHOP Storefront and InStock Goodies Storefront.  Discovery may reveal that additional entities and/or individuals also assist in the operation of the GOLDSHOP and InStock Goodies Storefronts and are responsible for the conduct complained of herein.

214.   On or about May 5, 2020, Herbal Brands sent a cease-and-desist letter to InStock Goodies Inc and Dats.  The letter asserted that InStock Goodies Inc and Dats are infringing on the Herbal Brands Trademarks, tortiously interfering with Herbal Brands' agreements with its Authorized Sellers, and causing harm to Herbal Brands.  The letter also informed InStock Goodies Inc and Dats that Herbal Brands is located in Arizona, is harmed in Arizona as a result of their illegal sales of infringing products bearing the Herbal Brands Trademarks, and that they would be subject to personal jurisdiction in Arizona if Herbal Brands filed suit.  The letter demanded that InStock Goodies Inc and Dats permanently cease selling products bearing the Herbal Brands Trademarks.

215.   As of the time of filing, Defendants have continued to advertise and sell products bearing the Herbal Brands Trademarks through their InStock Goodies Storefront on Amazon, without any interruption since their receipt of Herbal Brands' May 5, 2020 letter.

216.   On or about February 19, 2021, Herbal Brands mailed a cease-and-desist letter to Goldshop 300 Inc and Bichler at the address associated with the GOLDSHOP Storefront – 130 Lee Ave., # 300, Brooklyn, NY 11211 – as well as at the address associated with Bichler – 687 E. 5th St., Apt. 2, Brooklyn, NY 11218-5806.  The letter asserted that Defendants are infringing on the Herbal Brands Trademarks, tortiously interfering with Herbal Brands' agreements with its Authorized Sellers, and causing harm to Herbal Brands. The letter also informed Goldshop 300 Inc and Bichler that Herbal Brands is located in Arizona, is harmed in Arizona as a result of their illegal sales of infringing products bearing

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

the Herbal Brands Trademarks, and that they would be subject to personal jurisdiction in Arizona if Herbal Brands filed suit.  The letter demanded that Goldshop 300 Inc and Bichler permanently cease selling products bearing the Herbal Brands Trademarks.

217.    As of the time of filing, Defendants have continued to advertise and sell products bearing the Herbal Brands Trademarks through their GOLDSHOP Storefront on Amazon, without any interruption since their receipt of Herbal Brands' February 19, 2021 letter.

218.    On or about March 30, 2021, after discovering that the business name listed on the GOLDSHOP Storefront had changed to Photoshop Inc, Herbal Brands mailed a cease-and-desist letter to Photoplaza Inc and Heschel to the address listed for Heschel in Photoplaza Inc's corporate records, the business address for Photoplaza Inc listed in the records, and the business address listed on the GOLDSHOP Storefront.  The letter asserted that Photoplaza Inc and Heschel are infringing on the Herbal Brands Trademarks, tortiously interfering with Herbal Brands' agreements with its Authorized Sellers, and causing harm to Herbal Brands.  The letter also informed Photoplaza Inc and Heschel that Herbal Brands is located in Arizona, is harmed in Arizona as a result of their illegal sales of infringing products bearing the Herbal Brands Trademarks, and that they would be subject to personal jurisdiction in Arizona if Herbal Brands filed suit.  The letter demanded that Photoplaza Inc and Heschel permanently cease selling products bearing the Herbal Brands Trademarks.

219.    As of the time of filing, Photoplaza Inc and Heschel have not communicated any further with Herbal Brands and have continued to advertise and sell products bearing the Herbal Brands Trademarks through their GOLDSHOP Storefront on Amazon, without any interruption since their receipt of Herbal Brands' March 30, 2021 letter.

220.    Defendants have sold a high volume of infringing products bearing the Herbal Brands Trademarks through their GOLDSHOP Storefront.  Monitoring software estimates that, since February 2021, **Defendants have sold more than 1,800 infringing products through their storefront for revenue in excess of $49,000**.

221.    Defendants also have sold a high volume of infringing products bearing the

Herbal Brands Trademarks through their InStock Goodies Storefront. Monitoring software estimates that, since March 2020, **Defendants have sold more than 22,000 infringing products through their storefront for revenue in excess of $630,000.**

222. Through their GOLDSHOP and InStock Goodies Storefronts on the highly interactive Amazon website, Defendants have sold products bearing the Herbal Brands Trademarks to residents of Arizona through the regular course of business.

223. Defendants' continued sale of non-genuine products, despite being informed of their unlawful conduct, demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Tortiously Interfering with Herbal Brands' Contracts and Business Relationships with Its Authorized Sellers**

224. Upon information and belief, Defendants have purchased Herbal Brands Products from Herbal Brands Authorized Sellers for the purpose of unlawfully infringing upon, and materially damaging, the value of the Herbal Brands Trademarks by reselling the products on the Internet outside of Herbal Brands' quality controls.

225. Herbal Brands' agreements with its Authorized Sellers prohibit Authorized Sellers from selling Herbal Brands Products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

226. Defendants have known of this prohibition since May 5, 2020 when Herbal Brands first notified Defendants through its cease-and-desist letter that Herbal Brands has agreements with all of its Authorized Sellers that prohibit them from selling Herbal Brands Products to any person or entity that is not an Authorized Seller and intends to resell the products. Herbal Brands has reiterated this to Defendants at many points in the intervening year through subsequent cease-and-desist letters.

227. Herbal Brands' letters also informed Defendants that, by purchasing Herbal Brands Products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Herbal Brands and its Authorized Seller, and were interfering with Herbal Brands' agreements and business relationships.

228. Herbal Brands' letters also advised Defendants that if they continued to

acquire products from Herbal Brands' Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Herbal Brands' contracts and business relationships with its Authorized Sellers.

229.   Despite being provided this information, upon information and belief, Defendants have continued to acquire products from Herbal Brands' Authorized Sellers and then resell the products.

230.   Upon information and belief, Defendants do not disclose to Authorized Sellers that they intend to resell the products they purchase from Authorized Sellers.

231.   Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with Herbal Brands so they can acquire products bearing the Herbal Brands Trademarks and unlawfully infringe upon the Herbal Brands Trademarks by reselling the products to end-user consumers.

**Infringing Products Bearing Herbal Brands Trademarks That Defendants Are Selling Are Being Stored All Around the United States, Including in Arizona**

232.   Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

233.   Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will:  (i) itself store and ship products; or instead (ii) pay ongoing fees to have Amazon.com store the seller's products at "fulfillment centers" (*i.e.*, warehouses) operated by Amazon.com, and ship products to consumers once they have been purchased. Amazon.com offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

234.   When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

235.   However, sellers who use the "Fulfillment By Amazon" are not able to control

where Amazon.com stores sellers' products.  Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com.  These terms provide that Amazon.com can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

236.    Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state.  Amazon.com also promises to customers that all product orders it fulfills—including products that third-party sellers on Amazon sell to customers while using the "Fulfillment By Amazon" service— will be delivered within two days of purchase.  To live up to this promise, Amazon.com carefully distributes all products it stores for third-party sellers between its fulfillment centers, all around the country, to ensure that products can be delivered within two days of purchase, no matter where in the United States they are ordered from.

237.    As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com.

238.    Defendants are using Amazon.com's "Fulfillment By Amazon" service for many of the infringing products bearing the Herbal Brand Trademarks they are selling through their GOLDSHOP and InStock Goodies Storefronts.





239. The "Fulfillment by Amazon" service requires Defendants to ship their products to Amazon's warehouses and, if and when sold, the products are shipped by Amazon to the buyer. Amazon does not contact sellers for approval of the purchase. Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

240. By selling items through "Fulfillment by Amazon," Defendants agreed to have their products stored across the country, including in any one of the five Amazon fulfillment centers located in Arizona. *See* Hayley Ringle, *Go behind the scenes at Arizona's largest Amazon fulfillment center*, Phoenix Business Journal (Oct. 3, 2019), https://www.bizjournals.com/phoenix/news/2019/10/03/go-behind-thescenes-at-arizonas-largest-amazon.html.

241. Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Herbal Brands Trademarks to consumers nationwide, including customers located in Arizona, and is paying Amazon for the privilege to do so through commissions and fees. Defendants have not taken any steps to prevent residents of Arizona from purchasing products bearing the Herbal Brands Trademarks from Defendants' Amazon storefronts.

**Herbal Brands Has Suffered Significant Harm as a Result of Defendants' Conduct**

242.   As set forth above, the unauthorized sale of products bearing the Herbal Brands Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to Herbal Brands and its family of brands.

243.   When a consumer receives a poor quality, tampered with, or defective product bearing the Herbal Brands Trademarks from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Herbal Brands.  The consumer may also leave a negative online review of an Herbal Brands Product.  For these reasons, Defendants' ongoing sale of non-genuine products bearing the Herbal Brands Trademarks harms Herbal Brands and its family of brands.

244.   As a proximate result of Defendants' actions, Herbal Brands has suffered, and will continue to suffer, irreparable harm and significant monetary harm, including, but not limited to, loss of sales, damage to the value of its intellectual property and the goodwill associated with the Herbal Brands Trademarks, and damage to its existing and potential business relations.

245.   Herbal Brands is entitled to injunctive relief because Defendants will otherwise continue to unlawfully infringe on the Herbal Brands Trademarks, causing continued irreparable harm to Herbal Brands' reputation, goodwill, intellectual property, and brand integrity.

246.   Defendants' conduct was, and is, knowing, intentional, willful, malicious, wanton, and contrary to law.

247.   Defendants' willful infringement of the Herbal Brands Trademarks and continued pattern of misconduct demonstrate an intent to harm Herbal Brands

## **FIRST CAUSE OF ACTION**

### **Trademark Infringement**

### **15 U.S.C. §§ 1114, 1125(a)(1)(a)**

248.   Herbal Brands re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

249. Herbal Brands owns the Herbal Brands Trademarks.

250. Herbal Brands has registered the Herbal Brands Trademarks with the United States Patent and Trademark Office.

251. The Herbal Brands Trademarks are valid and subsisting trademarks in full force and effect.

252. Defendants willfully and knowingly used, and continue to use, the Herbal Brands Trademarks in interstate commerce for the purpose of selling products bearing the Herbal Brands Trademarks without Herbal Brands' consent.

253. Defendants are not Authorized Sellers of Herbal Brands Products.

254. The products Defendants sell bearing the Herbal Brands Trademarks do not come with Herbal Brands' Satisfaction Guarantee.

255. Herbal Brands has established and implemented legitimate and substantial quality control procedures with which genuine Herbal Brands Products must comply.

256. Herbal Brands abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

257. Herbal Brands' quality controls are material, as they protect consumers and prevent consumers from receiving poor quality products or poor customer service. When a consumer considers whether to purchase a product bearing the Herbal Brands Trademarks, whether the product is subject to and abides by Herbal Brands' quality control and customer service requirements is relevant to the consumer's purchasing decision.

258. The products Defendants sell bearing the Herbal Brands Trademarks are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements.

259. Because the products Defendants sell bearing the Herbal Brands Trademarks do not come with the Satisfaction Guarantee, and are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements, the products Defendants sell are materially different from genuine Herbal Brands Products sold by Authorized Sellers.

260.   Because the products Defendants sell bearing the Herbal Brands Trademarks are materially different from Herbal Brands Products sold by Authorized Sellers, the products Defendants sell are not genuine Herbal Brands Products.

261.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks interfere with Herbal Brands' quality controls and its ability to exercise quality control over products bearing the Herbal Brands Trademarks.

262.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are covered by the Satisfaction Guarantee and are subject to, and abide by, Herbal Brands' quality controls when, in fact, they are not.

263.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are genuine Herbal Brands Products when, in fact, they are not.

264.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are sponsored or authorized by Herbal Brands when, in fact, they are not.

265.   Defendants' unauthorized use of the Herbal Brands Trademarks has infringed and materially damaged the value of the Herbal Brands Trademarks and caused significant damage to Herbal Brands' business relationships.

266.   As a proximate result of Defendants' actions, Herbal Brands has suffered, and continues to suffer, immediate and irreparable harm.  Herbal Brands has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor quality products and post negative reviews that will remain on Amazon permanently, harming Herbal

Brands' reputation among consumers and the placement of its products in search results.

267.    Herbal Brands is entitled to recover its damages caused by Defendants' infringement of the Herbal Brands Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

268.    Herbal Brands is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Herbal Brands will suffer irreparable harm.

269.    Herbal Brands is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed the Herbal Brands Trademarks.

## **SECOND CAUSE OF ACTION**

### **Unfair Competition**

### **15 U.S.C. § 1125(a)(1)(A)**

270.    Herbal Brands re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

271.    Herbal Brands owns the Herbal Brands Trademarks.

272.    Herbal Brands has registered the Herbal Brands Trademarks with the United States Patent and Trademark Office.

273.    The Herbal Brands Trademarks are valid and subsisting trademarks in full force and effect.

274.    Defendants willfully and knowingly used, and continue to use, the Herbal Brands Trademarks in interstate commerce for the purpose of selling products bearing the Herbal Brands Trademarks without Herbal Brands' consent.

275.    Defendants are not Authorized Sellers of Herbal Brands Products.

276.    The products Defendants sell bearing the Herbal Brands Trademarks do not come with Herbal Brands' Satisfaction Guarantee.

277.    Herbal Brands has established and implemented legitimate and substantial quality control procedures with which genuine Herbal Brands Products must comply.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

278.   Herbal Brands abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

279.   Herbal Brands' quality controls are material, as they protect consumers and prevent consumers from receiving poor quality products or poor customer service.  When a consumer considers whether to purchase a product bearing the Herbal Brands Trademarks, whether the product is subject to and abides by Herbal Brands' quality control and customer service requirements is relevant to the consumer's purchasing decision.

280.   The products Defendants sell bearing the Herbal Brands Trademarks are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements.

281.   Because the products Defendants sell bearing the Herbal Brands Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements, the products Defendants sell are materially different from genuine Herbal Brands Products sold by Authorized Sellers.

282.   Because the products Defendants sell bearing the Herbal Brands Trademarks are materially different from Herbal Brands Products sold by Authorized Sellers, the products Defendants sell are not genuine Herbal Brands Products.

283.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks interfere with Herbal Brands' quality controls and its ability to exercise quality control over products bearing the Herbal Brands Trademarks.

284.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are covered by the Satisfaction Guarantee and are subject to, and abide by, Herbal Brands' quality controls when, in fact, they are not.

285.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because

Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are genuine Herbal Brands Products when, in fact, they are not.

286.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are sponsored or authorized by Herbal Brands when, in fact, they are not.

287.   Defendants' unauthorized use of the Herbal Brands Trademarks has infringed and materially damaged the value of the Herbal Brands Trademarks and caused significant damage to Herbal Brands' business relationships.

288.   As a proximate result of Defendants' actions, Herbal Brands has suffered, and continues to suffer, immediate and irreparable harm.  Herbal Brands has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor quality products and post negative reviews that will remain on Amazon permanently, harming Herbal Brands' reputation among consumers and the placement of its products in search results.

289.   Herbal Brands is entitled to recover its damages caused by Defendants' infringement of the Herbal Brands Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

290.   Herbal Brands is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Herbal Brands will suffer irreparable harm.

291.   Herbal Brands is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**THIRD CAUSE OF ACTION**

**False Advertising**

**15 U.S.C. § 1125(a)(1)(B)**

292.    Herbal Brands re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

293.    Herbal Brands is the owner of the Herbal Brands Trademarks.

294.    Herbal Brands has registered the Herbal Brands Trademarks with the United States Patent and Trademark Office.

295.    The Herbal Brands Trademarks are valid and subsisting trademarks in full force and effect.

296.    Through their Amazon storefronts, Defendants have willfully and knowingly used, and continue to use, the Herbal Brands Trademarks in interstate commerce for purposes of advertising, promoting, and selling Herbal Brands products without Herbal Brands' consent.

297.    Defendants' advertisements and promotions of their products unlawfully using the Herbal Brands Trademarks have been disseminated to the relevant purchasing public.

298.    Defendants have used, and continue to use, the Herbal Brands Trademarks to falsely advertise the products they sell, including, but not limited to, falsely advertising that the products they sell come with the Herbal Brands Satisfaction Guarantee when, in fact, they do not.

299.    Herbal Brands products purchased from Herbal Brands and its Authorized Sellers who comply with Herbal Brands' quality controls come with the Herbal Brands Satisfaction Guarantee.

300.    Herbal Brands cannot exercise its quality controls over products sold by unauthorized sellers, such as Defendants.  As such, products bearing the Herbal Brands Trademarks that are sold by unauthorized sellers who do not comply with Herbal Brands' quality controls do not come with the Herbal Brands Satisfaction Guarantee.

301.  The products Defendants sell bearing the Herbal Brands Trademarks are not authorized for sale by Herbal Brands.

302.  The products Defendants sell bearing the Herbal Brands Trademarks do not come with the Herbal Brands Satisfaction Guarantee.

303.  Defendants falsely advertise that the products they sell bearing the Herbal Brands Trademarks come with the Herbal Brands Satisfaction Guarantee.  As discussed above, Defendants' product listings specifically state that they come with the Herbal Brands Satisfaction Guarantee.

304.  This representation is false because the products Defendants sell bearing the Herbal Brands Trademarks do not come with the Herbal Brands Satisfaction Guarantee.

305.  Defendants' use of the Herbal Brands Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Herbal Brands Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products come with the Herbal Brands Satisfaction Guarantee when, in fact, they do not.

306.  Defendants' use of the Herbal Brands Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Herbal Brands Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Herbal Brands products that come with the Herbal Brands Satisfaction Guarantee when, in fact, they are not.

307.  Defendants' use of the Herbal Brands Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Herbal Brands Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Herbal Brands when, in fact, they are not.

308.  Defendants' unauthorized and deceptive use of the Herbal Brands Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that products Defendants advertise using the Herbal

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Brands Trademarks are genuine Herbal Brands products that come with the Herbal Brands Satisfaction Guarantee when, in fact, they do not.

309.   Defendants' unauthorized use of the Herbal Brands Trademarks in advertising, and otherwise, infringes on the Herbal Brands Trademarks.

310.   As a proximate result of Defendants' actions, Herbal Brands has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

311.   Herbal Brands is entitled to recover its damages caused by Defendants' infringement of the Herbal Brands Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

312.   Herbal Brands is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Herbal Brands will suffer irreparable harm.

313.   Herbal Brands is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false advertising.

**FOURTH CAUSE OF ACTION**

**Common Law Trademark Infringement and Unfair Competition**

314.   Herbal Brands re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

315.   Herbal Brands owns the Herbal Brands Trademarks.

316.   Herbal Brands has registered the Herbal Brands Trademarks with the United States Patent and Trademark Office.

317.   The Herbal Brands Trademarks are valid and subsisting trademarks in full force and effect.

318.   The Herbal Brands Trademarks, including the HERBAL CLEAN® trademark, are distinctive and widely recognized by the consuming public.  Herbal Brands Products are sold by Herbal Brands' network of Authorized Sellers throughout the United

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

States, including in Arizona.

319.    Herbal Brands is widely recognized as the designated source of goods bearing the Herbal Brands Trademarks.

320.    Defendants willfully and knowingly used, and continue to use, the Herbal Brands Trademarks in commerce for the purpose of illegally selling products bearing the Herbal Brands Trademarks in Arizona.

321.    Defendants are not Authorized Sellers of Herbal Brands Products.

322.    The products Defendants sell bearing the Herbal Brands Trademarks do not come with Herbal Brands' Satisfaction Guarantee.

323.    Herbal Brands has established and implemented legitimate and substantial quality control procedures with which genuine Herbal Brands Products must comply.

324.    Herbal Brands abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

325.    Herbal Brands' quality controls are material, as they protect consumers and prevent consumers from receiving poor quality products or poor customer service.  When a consumer considers whether to purchase a product bearing the Herbal Brands Trademarks, whether the product is subject to and abides by Herbal Brands' quality control and customer service requirements is relevant to the consumer's purchasing decision.

326.    The products Defendants sell bearing the Herbal Brands Trademarks are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements.

327.    Because the products Defendants sell bearing the Herbal Brands Trademarks do not come with the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Herbal Brands' quality control and customer service requirements, the products Defendants sell are materially different from genuine Herbal Brands Products sold by Authorized Sellers.

328.    Because the products Defendants sell bearing the Herbal Brands Trademarks are materially different from Herbal Brands Products sold by Authorized Sellers, the

products Defendants sell are not genuine Herbal Brands Products.

329.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks interfere with Herbal Brands' quality controls and its ability to exercise quality control over products bearing the Herbal Brands Trademarks.

330.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are covered by the Satisfaction Guarantee and are subject to, and abide by, Herbal Brands' quality controls when, in fact, they are not.

331.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are genuine Herbal Brands Products when, in fact, they are not.

332.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Herbal Brands Trademarks suggests that the products Defendants offer for sale are sponsored or authorized by Herbal Brands when, in fact, they are not.

333.   Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Herbal Brands Products when, in fact, they are not.

334.   Defendants' unauthorized sales of products bearing the Herbal Brands Trademarks and unauthorized use of the Herbal Brands Trademarks in advertising infringes the Herbal Brands Trademarks and constitutes unfair competition at common law.

335.   Defendants' knowing and willful use of the Herbal Brands Trademarks in connection with the unauthorized and illegal sale of products bearing the Herbal Brands Trademarks infringes on the Herbal Brands Trademarks and is contrary to honest practice in industrial and commercial matters.

336.    Defendants' unlawful actions and unauthorized use of the Herbal Brands Trademarks violate Herbal Brands' common law trademark rights and constitute trademark infringement and unfair competition.

337.    Defendants' unlawful actions and unauthorized use of the Herbal Brands Trademarks has infringed upon and materially damaged the value of the Herbal Brands Trademarks and caused significant damage to Herbal Brands' business relations.

338.    As a proximate result of Defendants' actions, Herbal Brands has suffered, and continues to suffer, immediate and irreparable harm.  Herbal Brands has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor quality products and post negative reviews that will remain on Amazon permanently, harming Herbal Brands' reputation among consumers and the placement of its products in search results.

339.    Herbal Brands has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

340.    Herbal Brands is entitled to punitive damages because Defendants have acted maliciously toward Herbal Brands or in an intentional disregard of the rights of Herbal Brands.

## **FIFTH CAUSE OF ACTION**

### **Tortious Interference with Contracts and Business Relationships**

341.    Herbal Brands re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

342.    Herbal Brands sells Herbal Brands Products exclusively to end-user consumers and to Authorized Sellers.

343.    Herbal Brands has entered into contracts with all of its Authorized Sellers that prohibit Authorized Sellers from selling Herbal Brands Products to third parties who are not Authorized Sellers and who intend to resell the products.

344.    Defendants are not, and have never been, Authorized Sellers and Herbal Brands has not, itself, sold any Herbal Brands Products to Defendants.

345.    Defendants have sold a high volume of products bearing the Herbal Brands Trademarks through their GOLDSHOP and InStock Goodies Storefronts on Amazon.

346.    Based on these facts, it is plausible and a reasonable inference that Defendants have purchased the products they are reselling from one or more of Herbal Brands' Authorized Sellers.

347.    Defendants have known that Herbal Brands' contracts with its Authorized Sellers prohibit Authorized Sellers from selling Herbal Brands Products to any seller who, such as Defendants, is not an Authorized Seller and intends to resell the products.

348.    Defendants have known of this prohibition since approximately May 5, 2020, through cease-and-desist letters they received from Herbal Brands.

349.    After being notified of this prohibition, and despite having knowledge of this prohibition, Defendants intentionally, knowingly and willfully interfered with Herbal Brands' contracts with its Authorized Sellers by inducing one or more Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

350.    In inducing Herbal Brands' Authorized Sellers to breach their contracts with Herbal Brands, Defendants acted without justification and for an improper and malicious purpose.  Defendants purchased Herbal Brands Products from Authorized Sellers—and in so doing, instigated a breach of the Authorized Sellers' contracts with Herbal Brands—so that Defendants could unlawfully infringe upon, and materially damage, the value of the Herbal Brands Trademarks by reselling the products on the Internet outside of Herbal Brands' quality controls, and in a manner that interferes with Herbal Brands' quality controls.

351.    Defendants also acted with wrongful means—specifically, upon information and belief, Defendants concealed, and continue to conceal, their intent to resell the products bearing the Herbal Brands Trademarks that they purchase from Authorized Sellers.

352.   Because Authorized Sellers are prohibited by contract from selling products to persons or entities who are not Authorized Sellers but intend to resell the products, Authorized Sellers would not have sold products to Defendants if they had known that Defendants intended to resell those products.

353.   Defendants knew that Authorized Sellers would be breaching their contracts by selling products to Defendants for purposes of resale, and would accordingly consider Defendants' intent to resell material to their decision to sell products to Defendants.

354.   Accordingly, Defendants' concealment of their intent to resell products is a wrongful omission of a material fact, which wrongfully induced Authorized Sellers to breach their contracts with Herbal Brands.

355.   Defendants were not parties to the contracts they caused Authorized Sellers to breach.

356.   Because Defendants have not disclosed how they have obtained the products bearing the Herbal Brands Trademarks they have resold, Herbal Brands must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants.   Defendants, however, know the sources of the products they have obtained and the basis for Herbal Brands' claim of tortious interference.   Herbal Brands' contracts with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for the purpose of resale.

357.   As a result of Defendants' conduct, Herbal Brands has suffered, and continues to suffer, damages including loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

358.   Herbal Brands is entitled to punitive damages because Defendants have acted maliciously toward Herbal Brands or in an intentional disregard of the rights of Herbal Brands.

## **PRAYER FOR RELIEF**

WHEREFORE, Herbal Brands prays for relief and judgment as follows:

A.      Judgment in favor of Herbal Brands and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants ("Enjoined Parties") as follows:

      i)      Prohibiting the Enjoined Parties from distributing, circulating, selling, offering to sell, advertising, promoting, or displaying, via the Internet or otherwise, any Herbal Brands Products or products bearing Herbal Brands' Trademarks;

      ii)     Prohibiting the Enjoined Parties from using Herbal Brands' Trademarks in any manner, including advertising on the Internet;

      iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Herbal Brands Products, as well as any products bearing any of the Herbal Brands Trademarks;

      iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Herbal Brands Trademarks, including:  invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

      v)      Requiring the Enjoined Parties to take all actions needed to remove

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1  Herbal Brands' Trademarks, and any reference to Herbal Brands

2  Products, from any website operated by or associated with the

3  Enjoined Parties.  These required actions include, but are not limited

4  to, removing all Herbal Brands Products and Herbal Brands

5  Trademarks from any online marketplace storefront operated by, or

6  associated with, the Enjoined Parties, including, but not limited to, the

7  Amazon storefront with Merchant ID A23802NT41XFIY and

8  currently known as "GOLDSHOP," and the Amazon storefront with

9  Merchant ID A25JBQL2ACUML9 and currently known as "InStock

10  Goodies," and requesting removal of any website operated by, or

11  associated with, the Enjoined Parties and containing Herbal Brands

12  Products or Herbal Brands Trademarks from Internet search engines,

13  including Amazon's product search and Google; and

14  vi)   Requiring the Enjoined Parties to destroy or return to Herbal Brands

15  all products bearing the Herbal Brands Trademarks in their possession,

16  custody, or control.

17  C.   An award of attorneys' fees, costs, and expenses; and

18  D.   Such other and further relief as the Court deems just, equitable and proper.

19  **<u>JURY DEMAND</u>**

20  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Herbal Brands demands

21  a trial by jury on all issues so triable.

22

23

24

25

26

27

28

1      DATED this 5th day of April, 2021.

2                                              SNELL & WILMER L.L.P.

3

4                                        By: *s/ Rachael Peters Pugel*
5                                            Rachael Peters Pugel
                                             One Arizona Center
6                                            400 E. Van Buren, Suite 1900
                                             Phoenix, Arizona  85004-2202
7                                            Attorneys for Plaintiff Herbal Brands,
                                             Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28